**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Cornell BYRD, Defendant-Appellant.**

**No. 84–1241.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1984.

Decided Dec. 10, 1984.

Rehearing Denied Jan. 15, 1985.

James D. O'Connell, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Edward H. Salomon, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, and BAUER and POSNER, Circuit Judges.

BAUER, Circuit Judge.

Defendant Cornell Byrd was convicted by a jury of one count of conspiracy to commit arson and one count of arson, in violation of 18 U.S.C. §§ 371 & 844(i). The defendant appeals from this judgment, arguing principally that certain communications between the defendant and his then estranged wife should have been excluded from introduction into evidence under the privilege for confidential marital communications. The defendant also asserts that the trial judge erred in permitting the introduction into evidence of a list of food and liquor stores, which evidence the defendant argues should have been barred as prejudicial under FED.R.EVID. 403. In addition, the defendant asserts that the government

failed to prove beyond a reasonable doubt that the alleged arson was committed using an "explosive," as that term is defined in 18 U.S.C. § 844(i). We affirm.

## I. FACTS

Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the facts of this case, simply put, are as follows. On the night of February 24, 1983, the Double Z Food and Liquor Store at 6810 S. Halsted, Chicago, Illinois exploded and burned. Defendant was charged with the arson and conspiracy to commit arson and the testimony at defendant's trial showed that beginning in January or February, 1983, the defendant had repeatedly discussed the idea of fire-bombing food and liquor stores with Ed Oden, the defendant's unindicted co-conspirator, and Eugene Nickerson, who later withdrew from the plans to firebomb Double Z. Both Oden and Nickerson testified that the defendant had shown them a list of addresses of the possible "jobs," each with $10,000 written beside it, and that he had solicited them to drive him to the stores he intended to fire-bomb.

Oden testified that on February 23, 1983, the defendant bought a large gas can and a hand drill and placed them in the trunk of Oden's car. On the night of February 24, 1983, Oden drove the defendant to the alley behind Double Z several times; on one occasion the defendant left Oden's car with the drill, saying he needed to drill holes. Later, Oden drove the defendant to a service station where the defendant purchased gas for the gas can and Oden and the defendant then returned to the Double Z alley. The defendant left Oden's car with the gas can and a rope. Moments later Oden heard an explosion and saw flames and debris coming from the Double Z. When the defendant got back into the car, he said that it was a piece of cake and

everything was fine. Oden and the defendant then left the Double Z alley.

An eyewitness, Noah White, also testified at trial that he had seen a man on the roof of the Double Z drilling holes, pouring gas into a funnel and throwing a flaming rag into the funnel. White was standing on a second floor porch across the alley from the Double Z. The area was lit by three lights in the alley. White also saw the man throw a gasoline can into a dumpster in the Double Z alley. White later identified the defendant in a photo spread as the man he had seen on the roof of the Double Z. Expert testimony at trial established that a five gallon gas can, which had been recovered from the dumpster, contained gasoline.

Oden and Nickerson both testified at trial that the week after the fire-bombing of Double Z the defendant had been concerned about whether he would be paid for the fire-bombing. The defendant said that the Reverend Turner had promised to pay him for the fire-bombing of the Double Z. Mrs. Byrd, the defendant's wife, from whom the defendant had been separated since March, 1982, also testified for the government at trial. Mrs. Byrd testified that she and the defendant had been married for about eight years before they separated. Mrs. Byrd had purchased her own home after the separation, but testified that she allowed the defendant to use the basement of her house as a workroom. Prior to trial, Mrs. Byrd filed divorce proceedings against the defendant. Mrs. Byrd testified at trial that she filed for a divorce because of the defendant's affairs with other women.[1]

Three incidents between Mrs. Byrd and the defendant are of particular importance in this appeal. Mrs. Byrd testified that on March 3, 1983, the defendant gave Mrs. Byrd a torn piece of paper and told her "tear up that piece of paper and throw it in the toilet." The paper contained a list of addresses of food and liquor stores, of

---

**1.** An offer of Mrs. Byrd's possible testimony indicated that on the morning of March 3, 1983, just before the conversations in issue, Mrs. Byrd received a phone call from her sister, who told her that their mutual sister had been raped by the defendant.

which the Double Z was not one. Mrs. Byrd did not flush the list, but went to the police and consented to a search of her house. In the search the police found, among other things, two cans of petroleum distillate and a hand drill with tar on the end of it. At this time, Mrs. Byrd also consented to let the police place a recording device on her phone.

The second incident occurred on March 18, 1983, after the defendant was jailed for an unrelated crime. The defendant called Mrs. Byrd and asked her "to pick some money up" for him. The defendant wanted Mrs. Byrd to go to Phoenix with Oden to collect $12,000 for him in payment for "the job." He told her to take $2,000 for herself, keep $9,500 for him, and give $500 to Oden. The defendant told Mrs. Byrd that he had "nobody else I trust" to collect his payment. The third incident testified to by Mrs. Byrd occurred on May 12, 1983, when the defendant told her that were she asked questions about the arson pursuant to a subpoena already served on her, she was to answer that she "don't know nothing about nothing."

■ The trial court ruled that the introduction of Mrs. Byrd's conversations with the defendant were admissible under the "joint participants" exception to the marital communications privilege. The "joint participants" exception holds that the privilege does not apply where the spouses are both participants in the crime at issue. The court also ruled that the list of stores was admissible and gave instructions on the definition of explosives pursuant to Section 844(i). The defendant was convicted of both counts of conspiracy to commit arson and arson, and was sentenced to ten years on the arson count. The defendant was sentenced to a consecutive five year probation term for the conspiracy count. We affirm the defendant's conviction.

## II. MARITAL COMMUNICATIONS PRIVILEGE

Defendant's first argument is that the judge erred in not excluding from the evidence the defendant's estranged wife's testimony regarding his requests to her to destroy the list of stores, help Oden collect the payment, and say that she knew nothing about the defendant's activities if questioned by the police. The defendant argues that the marital communications privilege barred the introduction of this evidence.

■ In a criminal trial the availability of any privilege is "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." FED.R.EVID. 501. Privileges such as the attorney-client, doctor-patient, or marital communications privilege exist at common law or by statute to protect those interpersonal relationships which are highly valued by society and peculiarly vulnerable to deterioration should their necessary component of privacy be continually disregarded by courts of law. Despite the importance of these privileges, the Supreme Court has held that they must be narrowly construed because they are in derogation of the search for truth which lies at the heart of a criminal trial. *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974); *see also United States v. Clark*, 712 F.2d 299, 301 (7th Cir.1983) (the privilege "generally retards truth-seeking."). The marital communications privilege, on which the defendant relies here, is closely related to the adverse spousal testimonial privilege, so that to understand the one, it is necessary to understand the relationship between the two privileges.

The common law testimonial privilege, squarely affirmed under federal law by the Supreme Court in *Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), permitted an accused to exercise the privilege to exclude voluntary adverse testimony by the accused's spouse.[2] In

**2.** One of the earliest statements of the common law rule occurs in *Lady Ivy's Trial*, 10 How. St.Tr. 557 (1684). "[B]y the law a husband cannot be a witness against his wife, nor a wife against her husband, to charge them with anything criminal, except only in cases of high

1980, the Supreme Court modified the *Hawkins* rule to hold that "the witness spouse alone has a privilege to refuse to testify adversely," and cannot be precluded from testifying by any assertion of the privilege by the defendant spouse. *Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 914, 63 L.Ed.2d 186 (1980). The Court in *Trammel* was careful to note, however, that "the *Hawkins* privilege is not needed to protect information privately disclosed between husband and wife in the marital relationship—once described by this Court as 'the best solace of human existence.' ... Those confidences are privileged under the independent rule protecting confidential marital communications." *Trammel*, 445 U.S. at 51, 100 S.Ct. at 912–13 (*quoting Stein v. Bowman*, 38 U.S. 209, 223, 10 L.Ed. 129 (1839) and *Blau v. United States*, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951)).

■ While this court has noted that "the underlying reason for both privileges is to preserve the family," *United States v. Van Drunen*, 501 F.2d 1393, 1396 (7th Cir.), *cert. denied*, 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974), there are differences in the purposes of the two privileges. The testimonial privilege looks forward with reference to the particular marriage at hand: the privilege is meant to protect against the impact of the testimony on the marriage. The marital communications privilege in a sense, is broader and more abstract: it exists to insure that spouses generally, prior to any involvement in criminal activity or a trial, feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law. *Appeal of Malfitano*, 633 F.2d 276, 279 n. 5 (3d Cir.1980). *See also United States v. Archer*, 733 F.2d 354, 359 (5th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 196, 83 L.Ed.2d 128 (1984); *United States v. Van Drunen*, 501 F.2d 1393, 1396 (7th Cir.), *cert. denied*, 419 U.S. 1091, 95

S.Ct. 684, 42 L.Ed.2d 684 (1974); Note, *Pillow Talk, Grimgribbers and Connubial Bliss: The Marital Communications Privilege*, 56 IND.L.J. 121, 127 n. 36 (1980–81) (noting that, in principle, the marital communications privilege's "protection of the immediate couple's privacy is merely incidental to its broader purpose.").

■ There are, therefore, differences in the operation of the privileges. The testimonial privilege, should the witness-spouse assert it, applies to all testimony against a defendant-spouse, including testimony on nonconfidential matters and matters which occurred prior to the marriage. 2 WEINSTEIN, EVIDENCE § 505–23 (1984). The communications privilege, assertable by the defendant himself, applies only to communications made in confidence between the spouses during a valid marriage. 8 WIGMORE, EVIDENCE § 2335–2337 (McNaughton rev. ed. 1961); 2 WEINSTEIN, EVIDENCE § 505 (1984). The confidentiality of communications made during a valid marriage is presumed. *Blau v. United States*, 340 U.S. 332, 333, 71 S.Ct. 301, 302, 95 L.Ed. 306 (1951); *Wolfe v. United States*, 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934). The testimonial privilege, however, may not be asserted after a marriage is terminated, because there is no longer any reason to protect that particular marriage. *See United States v. Lustig*, 555 F.2d 737, 747 (9th Cir.1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978); *United States v. Fisher*, 518 F.2d 836, 840 (2d Cir.), *cert. denied*, 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975). Moreover, courts seem to agree that the testimonial privilege may not be asserted where the marriage between the defendant and the testifying spouse is in fact moribund, though legally still valid. *United States v. Cameron*, 556 F.2d 752, 756 (5th Cir.1977) (no testimonial privilege where spouses did not share a residence,

treason. This is so known a common law rule that I thought it could not have borne any questions or debate." *Id.* at 644. (Whether the rule is as "common" as the Lord Chief Justice Jeffries asserts may be disputed, because it was

said of the Lord Chief Justice that what he was "wanting in knowledge, he made up in positiveness." *Id.* at 557. [How.St.Tr. Editor's Note.] The reference, however, gives a clue to the longevity of the testimonial privilege.)

had lived together only briefly, and husband lived permanently with and fathered a child by another woman); *United States v. Brown*, 605 F.2d 389, 396 (8th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979) (no testimonial privilege where wife was with husband for only two weeks and had not seen him in the eight months before the trial).

By comparison, the Supreme Court has held that "while divorce removes the bar of incompetency, it does not terminate the privilege for confidential marital communications." *Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1953). This survival of the communications privilege "is premised on the assumption that confidences will not be sufficiently encouraged unless the spouses are assured that their statements will never be subjected to forced disclosure." Note, 56 IND.L.J. at 131 & nn. 66–68.

The cases cited above involve assertions of the privilege where the communications are made before a separation or divorce occurs. We have found no federal cases, however, considering the question of whether the marital communications privilege applies to communications made while the parties are living in long-term separation. Professor Wigmore argues that the application of the privilege in such a situation "cannot be conceded," 8 WIGMORE, EVIDENCE § 2335 (1961), and counsels that it "would sometimes be pedantically unjust to recognize no exceptions" to the logic of the communications privilege. *Id.* at § 2341(3). *See also* Note, 56 IND.L.J. at 132–38.

Thus, we arrive at the arguments in this case. The defendant asserts that the separation of the defendant and Mrs. Byrd is irrelevant. The defendant argues that the communications took place in a valid marriage and the communications privilege should apply to exclude them from the evidence. The defendant also argues that the conversations were communications intended to be confidential, and that the "joint participants to a crime" exception to the privilege does not apply. The government argues that the communications privi-

lege does not apply in this case because the defendant and Mrs. Byrd were separated for over a year at the time of the communications at issue, and because the marriage of the defendant and Mrs. Byrd had deteriorated beyond repair, as evidenced by Mrs. Byrd's willingness to testify against the defendant. The government also argues that the communications regarding the payment are not privileged because they concern a business transaction. Finally, the government asserts that the "joint participants" exception does apply to the facts of this case.

We consider first the government's arguments that deterioration of the marriage and separation destroy the communications privilege. The government relies heavily on *Trammel* to support its deterioration argument, and, read broadly, there is much that is persuasive in the government's use of *Trammel's* language and reasoning to make its case.

In rejecting the *Hawkins* rule in *Trammel*, the Supreme Court recognized two foundations of the testimonial privilege. The testimonial privilege arose first from the fact that an accused was not permitted to testify in his own behalf. Because "husband and wife were one and ... women had no separate legal existence," *Trammel*, 445 U.S. at 44, 100 S.Ct. at 909, a wife was disqualified from testifying against her defendant-husband. The modern justification of the privilege is its "perceived role in fostering the harmony and sanctity of the marriage relationship." *Id.* The Court rejected both of these justifications for the testimonial privilege. As to the legal fiction inherent in the old common law rule of spousal incompetency, the Court reasoned:

> Nowhere in the common law world—indeed in any modern society—is a woman regarded as chattel or demeaned by denial of a separate legal identity and the dignity associated with recognition as a whole human being. Chip by chip, over the years those archaic notions have been set aside so that no longer is the female destined solely for the home and

the rearing of the family, and only the male for the marketplace and the world of ideas.

*Id.* at 52, 100 S.Ct. at 913 (citations omitted).

The Court also rejected the modern justification for the testimonial privilege reasoning that

> [w]hen one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve. In these circumstances, a rule of evidence that permits an accused to prevent adverse spousal testimony seems far more likely to frustrate justice than to foster family peace.

*Id.* at 52, 100 S.Ct. at 913.

■ We refuse to extend the reasoning in *Trammel* to apply to the communications privilege at issue in this case. Accordingly, we reject the government's argument that where the communications are made in a "deteriorated marriage," the communications privilege cannot apply. The government argues that in this case, as in *Trammel,* the fact that the defendant's spouse was willing to provide incriminating testimony should negate the communications privilege because there is "little left in the way of marital harmony for the privilege to preserve." *Id.* The government urges us, therefore, in the spirit of *Trammel,* to eliminate the communications privilege whenever a spouse is ready to testify as to communications made in a deteriorated marriage. This argument erroneously equates the purpose of the testimonial privilege with that of the communications privilege.

The marital peace at issue in *Trammel,* pursuant to the testimonial privilege, was that of Trammel and his spouse. The marital communications privilege at issue in this case, however, seeks to protect the institution of marriage generally as a haven for confidential communications. Therefore, the fact of the deterioration of the Byrd marriage and the absence of marital peace left to preserve in that marriage is, according to the strict logic of the purpose of the communications principle, irrelevant. Furthermore, the making of the determinations of when a marriage has deteriorated to the point when its communications are no longer confidential would involve courts in difficult factual inquiries in which we are reluctant to require trial courts to become involved.

■ We do not accept, however, the defendant's contentions that the three conditions of the communications privilege, requiring a communication made in confidence in a valid marriage, have been met in this case. Rule 501 instructs us that we must interpret the exercise of the privilege guided by "reason and experience." FED. R.EVID. 501. Moreover, while privileges are important, we must construe them narrowly to protect the search for truth. *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1983); *United States v. Clark,* 712 F.2d 299 (7th Cir.1983). Guided by these principles we accept the government's argument that the communications privilege does not apply where the communications occur between permanently separated spouses.[3]

■ The purpose of the communications privilege, which is to promote marriage as a haven for confidential communi-

---

**3.** The government also argues that the conversations about the arson are not privileged on the additional ground that they relate to business affairs and that their relationship to the spouse's marital relationship was incidental. This circuit has acknowledged the existence of such a privilege. *United States v. Kahn,* 471 F.2d 191, 194 (7th Cir.1972), *rev'd on other grounds,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). *See generally,* McCORMICK, EVIDENCE, Section 80 at 166–b) (2d ed. 1972). *Cf.* 4 A.L.R. 835 (1949) (discussing the application of the exception in civil cases). Because pursuant to our holding today all of the defendant's conversations are unprivileged because they were all made during a long term separation of the spouses, we do not need to decide whether the defendant's conversations about collecting his payment for the arson constitute a "business transaction" within the meaning of that exception.

cations, is a valid one.[4] The "solace" provided by a feeling of security in marital confidences is as important in today's world as it has always been.[5] Reason and experience guide us in concluding, however, that while it is in the interests of society for courts to protect the confidentiality of the marriage relationship, there is little societal interest in protecting the confidential relationship of permanently separated couples. The importance of the search for truth at issue in a criminal trial outweighs the interest in protecting separated couples' confidentiality. We agree with some commentators that the privilege probably only weakly serves the purpose for which it exists, in that few couples presumably know of this privilege or rely on it when making marital confidences. *See* Note, *supra,* 56 IND.L.J. at 132–35. *See also* Hutchins & Slesinger, *Some Observations on the Law of Evidence: Family Relations,* 13 MINN.L.REV. 675, 677 (1929). We agree, too, that the privilege may rest on the courts' desire to avoid "the naturally repugnant" sight of a spouse revealing marital confidences on the witness stand. Protecting the truth-seeking function of a trial should not be outweighed by oversensitivity to "embarrassing" testimony, however. C. McCORMICK, HANDBOOK OF THE LAW OF EVIDENCE, Section 86 (2d ed. E. Cleary 1972). Additionally, holding that permanent separation at the time of the communications negates the privilege does not impose on trial courts the heavy fact-finding burden that would have been imposed on the courts had we held that marital deterioration alone destroys the privilege.

We refuse to extend the communications privilege to permanently separated couples on the theory that a guaranteed protection of confidentiality at this stage might save some troubled marriages. *Cf. Appeal of Malfitano,* 633 F.2d 276, 278 (3d Cir.1980) (declined to uphold "joint participants in a crime" exception to the testimonial privilege on the theory that the protection of the privilege may tend "to help future integration of the spouse back into society"). Such a purpose is too speculative to justify a privilege that can severely hamper the truth-finding process essential to a criminal trial. Moreover, this circuit has interpreted strictly the "valid marriage" requirement in the testimonial privilege context. *See United States v. Van Drunen,* 501 F.2d 1393, 1397 (7th Cir.), *cert. denied,* 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974); *United States v. Clark,* 712 F.2d 299, 302 (7th Cir.1983) (both holding that the privilege does not protect communications that occur prior to marriage). *See also United States v. Pensinger,* 549 F.2d 1150, 1151 (8th Cir.1977); *Volianitis v. Immigration and Naturalization Service,* 352 F.2d 766, 768 (9th Cir. 1965) (same). *Cf. United States v. Lustig,* 555 F.2d 737 (9th Cir.1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978) (neither the marital communications privilege nor the testimonial privilege applies where the marriage is not valid under state law, though the couple have lived together as man and wife for years). We, too, therefore, strictly interpret that portion of the privilege's requirement and hold that only communications that take place during a valid marriage between couples still cohabiting pursuant to that marriage are protected by the privilege.

Arguably, the fact of separation at the time of the communications rebuts the presumption of confidentiality that is a requirement of the exercise of the privilege. The presumption has been justified by

---

**4.** *See generally, United States v. Neal,* 532 F.Supp. 942, 946 (D.Colo.1982) (the privilege preserves "some small island of privacy as a refuge for the human spirit").

**5.** "There is no place like a bed for confidential disclosures between friends. Man and wife, they say, there open the very bottom of their souls to each other; and some old couples often lie and chat over old times till nearly morning." H. MELVILLE, MOBY DICK 54 (Norton Critical Ed., New York 1967) (1st ed. New York 1851). Though Ishmael, Melville's narrator, shared his bed at the Spouter Inn with Queequeg, a "clean, comely-looking cannibal" tatooed a patchwork purple, we nonetheless think his musings on marital solace ring true.

courts on the grounds that communications within a marriage are intended to be private, yet are often made without a request for secrecy. Thus the difficult matter of proving the intent to keep the communications confidential is avoided by the presumption. *See generally, State v. Smith,* 384 A.2d 687, 691 (Me.1978); *Blau v. United States,* 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951); Note, *supra,* 56 IND.L.J. at 128–29, 133–34. We do not, however, base our holding today on the premise that communications made during a permanent separation lose the presumption of confidentiality. Such a holding would only involve courts in the difficult assessment of the intent of the communications, which the defendant would raise to reassert confidentiality once the presumption had been rebutted by the government's proof of the spouses' separated status. We decline to involve courts in this burdensome task. Our holding today is more categorical and looks to the purpose of the privilege. We hold that society's interest in protecting the confidentiality of the relationships of permanently separated spouses is outweighed by the need to secure evidence in the search for truth that is the essence of a criminal trial, and that proof of permanent separated status at the time of the communication between the defendant and the defendant's spouse renders the communications privilege automatically inapplicable.

■ Finally, because we hold today that communications made during a permanent separation are not privileged, we need not rely on the district court's holding that the communications at issue were excepted from the privilege because the defendant and Mrs. Byrd were "joint participants" in crime. This circuit has held that both the marital communications privilege and the testimonial privilege do not apply to communications made by spouses who are joint participants in a crime. *United States v. Kahn,* 471 F.2d 191, 194 (7th Cir.1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973), *rev'd on other grounds,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) (communications privilege); *United States v. Van Drunen,* 501 F.2d 1393, 1396 (7th Cir.), *cert. denied,* 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974) (testimonial privilege). *See also United States v. Mendoza,* 574 F.2d 1373 (5th Cir.), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978) (communications privilege). *But see Appeal of Malfitano,* 633 F.2d 276, 279 n. 5 (3d Cir.1980); *United States v. Geller,* 560 F.Supp. 1309, 1327 (E.D.Pa.1983). The privilege has been held not to apply because the communications "had to do with the commission of a crime and not with the privacy of the [defendant's] marriage." *Kahn,* 471 F.2d at 194.

■ The defendant argues that the joint participation exception does not apply to this case, and we must agree with his analysis. Mrs. Byrd was not indicted in this case and there is no indication that she was an unindicted co-conspirator. The record does not indicate that she was involved in the planning of the arson or that she did anything to cover or conceal the crime. Indeed, Mrs. Byrd did just the opposite. She cooperated with the police in ensnaring her husband, and with the government in testifying against him. There is no showing that she did so in return for immunity from prosecution. Thus, the "joint participant" exception to the marital communication privilege finds no applicability to the instant facts.

## III. EVIDENCE REGARDING OTHER ARSONS

■ The defendant's second claim of error is that the trial court abused its discretion by allowing evidence of a larger conspiracy beyond the scope of the conspiracy alleged in the indictment. The defendant argues that the testimony regarding lists, and one list itself, should have been excluded as unduly prejudicial under FED. R.EVID. 403. The government responds that the evidence of the lists was properly admitted because the arson of the Double Z was planned as the first in a series of the fire-bombing of stores. We agree with the government's argument. The lists were an

inextricable part of the proof of the plan to burn the Double Z and the larger scheme of which it was a part.

First, the testimony of Nickerson and Oden regarding the preparation for the arson of the Double Z unavoidably involved proof that other arsons were contemplated by the defendant. When the defendant referred to "the job" when planning it with Nickerson he did not use "Double Z" but referred to this store as "one of the places ... on the list." The defendant also referred to the other "jobs" which both Oden and Nickerson could do if they were to help him with the Double Z "job."

Furthermore, the probative value of the testimony about the lists and the possibility of other arsons is very high since the defendant only referred to Double Z as "one of the places on the list." The danger of undue prejudice was limited by the fact that the trial court instructed the jury to consider such other acts only on the question of plan, intent, and knowledge. Finally, out of 256 pages of transcripts, only three pages contain references to other contemplated arsons. We conclude, therefore, that the trial judge committed no error in admitting the lists into evidence.

## IV. "EXPLOSIVE"

Defendant contends finally that insufficient evidence was presented as to whether an "explosive" was used in the Double Z arson as that term is defined in 18 U.S.C. § 844(i). The defendant's argument is without merit. Gasoline and gasoline soaked towels which exploded when ignited constitute an "explosive" within the meaning of 18 U.S.C. § 844(i).[6] *United States v. Xheka*, 704 F.2d 974, 979 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct.

486, 78 L.Ed.2d 682 (1983). Oden testified that he bought gasoline with the defendant and that the defendant poured it into holes drilled into the roof of the Double Z. White testified that he saw the defendant pour a substance from a gas can into holes drilled into the roof of the Double Z before lighting a rag and throwing it onto the roof of the Double Z and that he then saw the defendant throw a gas can into a nearby dumpster. This gas can was recovered and analyzed by the government's chemist, who found it to contain gasoline. Finally, the fact that an "explosion" occurred immediately after the defendant ignited what he had poured into the Double Z, as both Oden and White testified, also demonstrates that an "explosive" was used. *See Xheka*, 704 F.2d at 979. We therefore believe that ample evidence was presented to permit a rational trier of fact to find that the substance defendant poured through the roof of the Double Z was gasoline and that the combination of the gasoline and air inside the Double Z exploded when ignited. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

## V. CONCLUSION

For the aforementioned reasons, we reject the defendant's arguments that evidence should have been excluded from his trial for arson and conspiracy to commit arson under the marital communications privilege or under FED.R.EVID. 403. We also reject the defendant's claim that there was insufficient evidence to show that an explosive was used during the arson of Double Z. Defendant's conviction for arson and conspiracy to commit arson, therefore, is affirmed.

---

6. The district court properly instructed the jury that the term

> explosive means: one, an incendiary device; and two, any chemical compound or mechanical mixture of device that contains combustible units, or other ingredients in such proportions or quantities or packing, that an ignition by fire of that compound or mixture or device, or any part of that may cause an explosion ... [and that] gasoline and air mixed under proper conditions to form a potentially explosive mixture constitutes an explosive mixture within the meaning of the statute ... [and that] gasoline spread within a building for purposes of destroying property by fire in combination with a delayed ignition device having components designed to ignite that gasoline is under the law, an incendiary device similar to a fire or incendiary bomb or grenade.

Tr. 387.