In re WITNESS BEFORE the GRAND JURY.

UNITED STATES of America, Plaintiff-Appellant,

v.

WITNESS BEFORE the GRAND JURY, Defendant-Appellee.

No. 1038, Docket 86–6012.

United States Court of Appeals, Second Circuit.

Argued April 4, 1986.

Decided May 22, 1986.

Stanley A. Twardy, Jr., U.S. Atty., D.Conn., Bridgeport, Conn. (James T. Cowdery, Asst. U.S. Atty., D.Conn., Bridgeport, Conn., of counsel), for plaintiff-appellant.

Robert M. Simels, P.C., New York City, for defendant-appellee.

Before LUMBARD, OAKES and NEWMAN, Circuit Judges.

LUMBARD, Circuit Judge:

The government appeals from an order of the District of Connecticut, Warren W. Eginton, J., allowing Geneva Carter, a witness before the federal grand jury, to refuse to answer questions that allegedly violate the "confidential communications" marital privilege she purports to share with her estranged husband, Robert Carter. Although the district court accepted Mrs. Carter's assertion of the confidential communications privilege, the court rejected her assertion in the alternative of the "adverse testimony" marital privilege; the court noted that the Carters have now been separated for twelve years, that Robert Carter has in that time lived with another woman whom he has represented as his wife and by whom has has fathered a child, and thus that the couple does not have the kind of "vital" marriage that the latter privilege is meant to protect. The appeal is taken pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

The government argues (1) that the confidential communications privilege does not shield the Carters from inquiries into the dealings at issue, which occurred at least four years after their permanent separation; (2) that, in any event, the questions concern acts and not "communications"; and (3) that, even if the dealings were considered communications, they were not confidential. The government urges, further, that the district court correctly viewed the adverse testimony privilege as inapplicable to the Carters' "moribund" marriage. We agree. Accordingly, we reverse and remand for further proceedings.

On October 4, 1985, the government served Geneva Carter with a subpoena duces tecum to appear and produce documents before a federal grand jury in Bridgeport, Connecticut, which was investigating allegations of federal narcotics and tax violations by Robert Carter.[1] Although Mrs. Carter failed to appear on her first scheduled date, October 9, because of illness, she did appear on November 14, when the grand jury next sat. Mrs. Carter was accompanied by Robert Carter's counsel, and was advised that she could consult with counsel outside the grand jury room. She indicated to the government her understanding that she was neither a subject nor a target of the grand jury's investigation.

Mrs. Carter testified before the grand jury that she had been married to Robert Carter for 23 years, but had not lived with him for the past eleven. Nevertheless, she refused to answer questions, most on the basis of a vague "husband and wife" privilege. Mrs. Carter was asked to consult with her attorney to determine whether she had any other basis for refusing to answer, and after this consultation she reiterated: "[B]ased on the fact that I am married to Robert Carter I do not have to answer any questions." She did not claim any other privileges at that time.

The Assistant U.S. Attorney then asked Mrs. Carter a series of questions, primarily regarding the Carters' business and finan-

---

1. On October 8, 1985, Robert Carter moved to quash the subpoena directed to Geneva Carter, arguing that the Connecticut grand jury was being used improperly to gather evidence in a separate case pending against Mr. Carter in the Eastern District of New York. Judge Eginton denied the motion on October 9.

cial affairs during the period from January, 1979, to March, 1984 (see Appendix A). The questions concerned, among other subjects, joint bank accounts, jointly owned real estate, loans and gifts between the couple, and whether Robert Carter had contributed to Mrs. Carter's support or to the support of her dependents. Mrs. Carter responded only that this was "privileged information." The government requested that the witness clarify which of the marital privileges she was asserting, and, after consultation with her attorney, Mrs. Carter stated that she was claiming both "the husband and wife and ... the communication privilege." She also stated that, upon her attorney's advice, she had not brought with her the documents requested in the subpoena duces tecum. Near the end of the proceedings, Mrs. Carter said that she was not going to answer any questions, regardless of her basis for refusal; she was at this point excused from the grand jury room.

On November 25, 1985, the government moved in the district court for an order compelling testimony, which Mrs. Carter opposed solely on the basis of the marital privileges. The district court conducted a hearing on December 9. Terrence Sprankle, a Drug Enforcement Agency Special Agent, testified that he had been told by an Internal Revenue Service agent that Robert Carter, together with a woman known as Sharon Spruel Carter, had filed joint tax returns as husband and wife for 1981, 1982, and 1983. Sprankle also testified that the I.R.S. agent had told him that Robert and Sharon Spruel Carter had appeared in April, 1984, at the I.R.S. office in Fayetteville, North Carolina, and identified themselves as husband and wife; they claimed to have been married in New York City in 1970. They also told the I.R.S. that they had a twelve-year-old son, whom they claimed as a dependent on their joint federal tax returns.

At the conclusion of the evidence, Judge Eginton denied the government's motion to compel. He found that, because of the "moribund" state of the Carters' marriage, the "adverse testimony" marital privilege was not available as an absolute shield to Geneva Carter's testimony against Robert Carter. Accordingly, he directed Mrs. Carter to answer the grand jury's general questions identifying herself and Mr. Carter. Judge Eginton also found, however, that Geneva Carter could refuse to answer a large portion of the grand jury's questions on the basis of the "broader and more abstract" confidential communications privilege, which he found shielded the Carters' dealings no matter how long the couple had been separated. Judge Eginton rejected the government's argument that this latter privilege should protect from disclosure only those communications made during a marriage that exists *in fact*, stating that as long as no "legal separation" has occurred, the privilege still applies. He noted his view that a contrary holding would require the district courts to engage in burdensome evaluations of whether a legally married couple were still "intimate," or whether they were permanently separated. An opinion was filed expressing the district court's views on February 13, 1986.

The government appeals, arguing that the district court erred in allowing Geneva Carter to invoke the confidential communications privilege, and that she should be compelled to answer all of the grand jury's questions about Robert Carter. We agree.

### The Marital Privileges

In trials under federal law, the federal courts interpret testimonial privileges by reference to the common law and "in light of reason and experience." Fed.R. Evid. 501. At common law, the marital testimonial privileges have developed along two lines. The first to develop, the adverse testimony privilege, has generally been thought to have "flowed from two tenets of medieval jurisprudence: first, that a wife had no legal identity independent of her husband's, and second, that an accused could not testify on his own behalf." Note, *Developments in the Law—Privileged Communications*, 98 Harv.L.Rev. 1450, 1564 (1985) (citing *Trammel v. United States*, 445 U.S. 40, 44, 100 S.Ct. 906, 909,

63 L.Ed.2d 186 (1980)); *but see* Note, *supra,* at 1564–65 (discussing Wigmore's contrary view that the privilege arose from the sixteenth-century English law prohibiting petit treason against the head of the household). When it applies, the adverse testimony privilege protects spouses from being compelled to testify against each other, on any subject, while they are validly married. *Trammel, supra,* at 44, 100 S.Ct. at 909.

The confidential communications privilege, by contrast, shields only communications made in confidence during a valid marriage but, unlike the adverse testimony privilege, it may be asserted even after the marriage has been terminated. *See Pereira v. United States,* 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954). The privilege, which first appeared in the 1850's as a reaction to the shrinking scope of the adverse testimony privilege, *see Note, supra,* at 1565, stemmed from many state legislatures' recognition of the need for explicit protection of confidential marital communications. *See 8 J. Wigmore, Evidence in Trials at Common Law,* § 2333, at 645 (J. McNaughton rev. ed. 1961). Consequently, this privilege can be successfully asserted only when there exists a marriage valid at the time the communication is made. Note, *supra,* at 1565 & n. 16. The burden of showing the existence of such a valid marriage rests on the person seeking to invoke the privilege. *See United States v. Snyder,* 707 F.2d 139, 147 (5th Cir.1983); Note, *supra,* at 1565 n. 16.

The two privileges have related but distinct purposes. The adverse testimony privilege embodies society's desire to protect viable marriages from the potentially irreparable rifts that may result from compelled disclosure or commentary before a tribunal. The confidential communications privilege, by contrast, provides assurance that all private statements between spouses—aptly called the " 'best solace of human existence,' " *Trammel,* 445 U.S. at 51, 100 S.Ct. at 913 (quoting *Stein v. Bowman,* 13 U.S. (Pet.) 209, 223 (1839))—will be forever free from public exposure. We now turn to the district court's consideration of the two privileges in the case of Robert and Geneva Carter.

*Adverse Testimony Privilege* —Because the purpose of this privilege is to protect vital marriages from the possible harmful effect of compelled testimony, the privilege logically has no relevance to marriages that are over or damaged beyond repair. As Judge Eginton noted, two circuits have refused to apply the privilege to "legally married" couples whose marriages were either sham or moribund. *See United States v. Brown,* 605 F.2d 389, 396 (8th Cir.), *cert. denied,* 444 U.S. 972, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979); *United States v. Cameron,* 556 F.2d 752, 756 (5th Cir. 1977). At the time of the grand jury investigation, the Carters had lived apart for eleven years, in which time Robert Carter had lived with, sired a child by, and represented himself as married to, another woman. Although Carter maintained cordial relations with Geneva Carter and the couple made joint decisions regarding certain finances and regarding their son, they did not have the kind of vital marriage for which the privilege was created and in protection of which it is commonly deployed.

This reasoning comports with the *Trammel* case, *supra,* in which the Supreme Court held that the adverse testimony privilege could not be invoked by one spouse seeking to block the voluntary testimony of another spouse. The Court reasoned that if one spouse was willing to testify against the other, then the marriage was obviously beyond repair and the protections of the adverse testimony privilege had no relevance. Similarly, in *United States v. Fisher,* 518 F.2d 836, 840 (2d Cir.), *cert. denied,* 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975), we rejected Fisher's attempt to invoke the adverse testimony privilege against his wife, who had appealed from a Nevada divorce decree that Fisher had obtained. Although Fisher claimed that because of his 'wife's' appeal he was still legally married, we held that the privilege would not apply in any event because the marriage was moribund—Fisher had been living with another woman by whom he had

had two children. *See* 518 F.2d at 840. The court noted that "the [adverse testimony] privilege does not extend to a 'marriage' so obviously destroyed as the one here." *Id.* at 841.

*Trammel* and *Fisher* demonstrate that courts may properly inquire into whether a marriage is vital enough to justify recognition of the adverse testimony privilege in each case. In light of this inquiry, we agree with the district court's holding that the adverse testimony privilege is not available to the Carters.

*Confidential Communications Privilege*—As we have noted, this privilege applies only to communications made in confidence during a valid marriage. We think that the district court's finding that Mrs. Carter could refuse to answer many of the grand jury's questions on the basis of the privilege is flawed in several respects.

■ First, it is undisputed that the Carters had lived apart for at least four years by the time the first "communications" at issue occurred. Robert Carter had during that time been living with Sharon Spruel Carter, by whom he had fathered a child. The Carters thus present less of a case for a "valid marriage" than did the couple in *United States v. Byrd*, 750 F.2d 585 (7th Cir.1984), where the court denied the privilege to shield communications that had occurred one year after the spouses had separated. The *Byrd* court noted that permanent—and not necessarily "legal"—separation eliminated the availability of the privilege, stating that "society's interest in protecting the confidentiality of the relationships of permanently separated spouses is outweighed by the need to secure evidence in the search for truth...." *Id.* at 594; *see Trammel, supra*, 445 U.S. at 51, 100

S.Ct. at 913 (mandating strict construction of the marital privileges). We agree with the *Byrd* court's limitation of the communications privilege, and find the restriction particularly appropriate in the Carters' case. *See also United States v. Nixon*, 418 U.S. 683, 709–10, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) (calling for strict construction of all evidentiary privileges because they impede the truth-seeking process).

The district court found the *Byrd* court's reasoning "persuasive," but nonetheless declined to follow it, believing that a permanent separation should displace the communications privilege only where the separation was confirmed by a judicial decree. The district court noted its concern that, if *Byrd* were applied in the absence of "legal separation," the district courts would be forced into burdensome analyses of whether particular marriages were or were not "moribund." We disagree. We do not share the district court's concern regarding the difficulty of the "separation" inquiry. In the rare case that even presents this question, we believe that a court may rely primarily on the duration of the couple's physical estrangement, which is the guiding factor in determining "permanent separation" and which is usually clear from the record. The longer the period of estrangement at the time of the subject "communications," the easier it will be for the government to show that the couple, though still legally wed, had been in fact permanently separated and thus could not invoke the privilege. Of course, either party may bring forward special circumstances that render more or less likely the objective possibility of reconciliation at the time of the communications, upon which the couple may have relied.[2] The Carters have

---

2. The district court's concerns would be more compelling in a case where the couple still regularly or occasionally cohabited, but where the government contended that the marital relationship had irrevocably deteriorated. It might well be burdensome for a district court to consider such a dilemma—more properly brought to the family court—and indeed most of the cases the Carters have cited arose in this context. *See United States v. Sims*, 755 F.2d 1239, 1243 n. 3 (6th Cir.1985) (eschewing inquiry into the relations of cohabiting spouses); *In Re Malfitano*, 633 F.2d 276, 279 (3d Cir.1980) (same); *see generally* Note, *supra*, at 1566 (discussing the courts' avoidance of such analyses). This dilemma does not arise in the case of the Carters, however, who had lived apart for some time and whose permanent and irrevocable separation is clear from the record.

shown no such possibility, and it is indeed clear that they have long maintained separate lives. Accordingly, we reverse the district court's holding that Mrs. Carter may assert the confidential communications privilege against the grand jury questions at issue.

■ We also believe that the communications privilege is unavailable to Mrs. Carter because most of the evidence sought by the grand jury does not involve marital "communications," that is, utterances or expressions intended to convey information between spouses. *See Pereira, supra,* 347 U.S. at 6, 74 S.Ct. at 361. Whereas the paradigmatic case would be the marital bed confidence, the government's questions to Geneva Carter concern, for example, whether the couple had a joint checking account, whether they jointly owned real estate, and whether they loaned money to each other. For the most part, the grand jury is not inquiring into the Carters' marital communications, but rather into actions that are not communicative and that may be described without divulgence of privileged communications. Such inquiries are not barred by the privilege. *See id.; United States v. Klayer,* 707 F.2d 892, 894 (6th Cir.) (question whether married couple owned a silver tray involved acts, not communications), *cert. denied,* 464 U.S. 858, 104 S.Ct. 180, 78 L.Ed.2d 161 (1983); *United States v. Smith,* 533 F.2d 1077, 1079 (8th Cir.1976) (husband's hiding heroin on his spouse's person was action, not communication).

■ Finally, we have serious doubts as to whether most of the dealings at issue between Robert and Geneva Carter were, in any event, sufficiently "confidential" to justify applying the confidential communications privilege. Although "communications" between spouses are presumed to be confidential, *see Blau v. United States,* 340 U.S. 332, 333, 71 S.Ct. 301, 302, 95 L.Ed. 306 (1951), this presumption is rebutted when the communicant knew that the information was or would be disclosed to third parties or to the public. *See Wolfle v. United States,* 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934) (husband's letter to wife not "confidential" because it had been dictated to stenographer); 8 J. Wigmore, *supra,* § 2336, at 648–51 (discussing strict federal view of "confidentiality" requirement). Those questions posed to Geneva Carter that concerned, *inter alia,* bank accounts, real estate transactions, credit cards, car registration, and payment of insurance premiums, *see* Appendix A, therefore appear not to be "confidential" as the federal courts have defined that term.

We affirm the district court's holding that Geneva Carter may not validly assert the "adverse testimony" marital privilege, on the ground that the Carters' marriage has long ceased to exist as a going concern. We reverse, however, the court's holding that Mrs. Carter may refuse to answer a large part of the grand jury's questions on the basis of the confidential communications privilege. We think the record clearly shows that the Carters were permanently separated, with no possibility of reconciliation, at the time the dealings at issue occurred; further, the grand jury is inquiring mostly into the Carters' actions, not their "communications." Finally, we have serious doubts that many of the dealings at issue here were "confidential" as that term has been defined in the federal courts.[3]

Reversed and remanded for further proceedings.

## APPENDIX A

Q. During the period of time from January 1979 through March of 1984 do you know how Robert Carter was employed?

\*     \*     \*

Q. During the period of time from January 1979 through March of 1984, did you ever work for Robert Carter or for any of his businesses?

\*     \*     \*

---

**3.** We need not consider any fifth amendment privilege that Geneva Carter may have, as she asserted it neither before the grand jury nor before the district court.

Q. During the period of time from January 1979 through March of 1984, did Robert Carter ever pay you a salary?

\* \* \*

Q. During the period of time from January 1979 to March of 1984, did you ever have a bank account joint with Robert Carter?

\* \* \*

Q. Did you ever have during the same period of time, January 1979 through March of 1984, did you ever have a savings account jointly with Robert Carter?

\* \* \*

Q. Did you ever have a checking account jointly with Robert Carter from January 1979 through March of 1984?

\* \* \*

Q. Did you ever have a certificate of deposit jointly with Robert Carter between January 1979 and March of then 1984?

\* \* \*

Q. Did you ever have a retirement account between January of 1979 and March of 1984 that you held jointly with Robert Carter?

\* \* \*

Q. Between January of 1979 and March of 1984, did you ever obtain any loans from a bank or any lending institution jointly with Robert Carter for any purposes such as a personal loan, an automobile loan, a home improvement loan or a mortgage loan?

\* \* \*

Q. In 1985 did you and Robert Carter jointly purchase a home in Elmont, New York?

\* \* \*

Q. Between January 1979 and March of 1984, did you own any real estate with Robert Carter?

\* \* \*

Q. Between January of 1979 and March of 1984, did you own any business with Robert Carter?

\* \* \*

Q. Between January of 1979 and March of 1984, did you own any motor vehicles, motorcycles, boats, airplanes or motor homes or any other motorized vehicle jointly with Robert Carter?

\* \* \*

Q. Between January of 1979 and March of 1984, did Robert Carter ever lend you any money?

\* \* \*

Q. Between January of 1979 and March of 1984, did you lend Robert Carter any money?

\* \* \*

Q. Between January of 1979 and March of 1984, did Robert Carter ever give you any money?

\* \* \*

Q. Between January of 1979 and March of 1984, did you ever give Robert Carter any money?

\* \* \*

Q. Between January of 1979 and March of 1984, did Robert Carter ever give you any gifts whose value exceeded $50?

\* \* \*

Q. Between January of 1979 and March of 1984, did you ever give Robert Carter any gifts whose value exceeded $50?

\* \* \*

Q. Between January of 1979 and March of 1984, did Robert Carter ever pay any insurance premiums on your behalf or on behalf of any of your dependents for life insurance, health insurance, auto insurance or homeowner's insurance?

\* \* \*

Q. Did you ever pay any insurance premiums on Mr. Carter's behalf during the same time period for the same kinds of policies?

\* \* \*

Q. Between January of 1979 and March of 1984, did you ever have any credit card accounts with Robert Carter?

\* \* \*

Q. Between January of 1979 and March of 1984, did you ever use any credit cards belonging to Robert Carter?

\* \* \*

Q. Between January of 1979 and March of 1984, did Robert Carter ever use any credit card accounts belonging to you?

\* \* \*

Q. Between January of 1979 and March of 1984, did you ever pay any rent to Robert Carter?

\* \* \*

Q. Between January of 1979 and March of 1984, did Robert Carter ever pay any rent to you?

\* \* \*

Q. Between January of 1979 and March of 1984, did Robert Carter ever contribute to your support or the support of any of your dependents?

\* \* \*

Q. Between January of 1979 and March 1984, did Robert Carter use your address as a mailing address?

\* \* \*

Q. For the same period of time, January 1979 through March of 1984, did Robert Carter use your address to register a motor vehicle?

\* \* \*

Q. When was the last time you saw Robert Carter?

OAKES, Circuit Judge (concurring):

I cannot agree with Judge Lumbard's approach to the confidential marital privilege, preserved by *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980), and by congressional rejection of proposed Fed.R.Evid. 505, *see* 2 J. Weinstein & M. Berger, *Weistein's Evidence* 505–1 (1975). Like the district court, I feel it is too amorphous a task for federal courts to determine the degree of viability (or lack of viability) of a marriage. Thus, I prefer the bright line drawn by legal separation or divorce. *See United States v. Sims*, 755 F.2d 1239, 1243 n.3 (6th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985); *In re Malfitano*,

633 F.2d 276, 279 (3d Cir.1980); *United States v. Lilley*, 581 F.2d 182, 189 (8th Cir.1978); *People v. Fields*, 38 A.D.2d 231, 233, 328 N.Y.S.2d 542, 544–45 (1st Dep't), *aff'd*, 31 N.Y.2d 713, 289 N.E.2d 557, 337 N.Y.S.2d 517 (1972).

But at the same time I agree with what I view as Judge Lumbard's alternate, and narrower, ground of decision, namely, that the questions the grand jury sought to ask here, *see* majority op. App. A, did not pertain to "confidential" communications. So saying, I would not go so far as to find that all nonverbal acts are excluded from the privilege; rather, I accept the majority rule that all acts intended to convey a message are privileged. *See* Note, *Developments in the Law—Privileged Communications*, 98 Harv.L.Rev. 1450, 1572 & nn. 67–69 (1985). The questions propounded here seem to me to relate either to non-communicative acts (e.g., did Robert Carter ever pay you a salary or lend or give you money?), to information not involving a communication (e.g., when was the last time you saw Robert Carter?, did Robert Carter use your address to register a motor vehicle?), or to communications which involved third party disclosure and hence lost their confidentiality, *id.* at 1573–74 (e.g., did Robert Carter pay any insurance premiums on your behalf?, did you ever have any credit card accounts with Robert Carter?, do you know how Robert Carter was employed?, *but see Hipes v. United States*, 603 F.2d 786, 788 & n. 1 (9th Cir.1979)). Accordingly, I fail to see how any of the questions calls for revelation of a confidential communication. *See generally* 8 J. Wigmore, *Evidence* § 2337 (McNaughton rev. 1961). Hence I concur in the judgment, recognizing that were the majority of the panel to agree with my approach to the case argument on remand directed more specifically to the individual questions might conceivably reveal elements of communication or confidentiality or both not presently visible to this observer.