UNITED STATES of America, Plaintiff–Appellee,

v.

Gustavo CHAVERRA–CARDONA and Oscar Urego, Defendants–Appellants.

Nos. 87–2958, 87–2960.

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1989.

Decided July 19, 1989.

Jerry B. Kurz, Kathryn Hall, Hall & Kurz, Chicago, Ill., for defendants-appellants.

Anton Valukas, U.S. Atty., David J. Stetler, Chief, Criminal, James R. Ferguson, Victoria J. Peters, Deputys, Patrick J. King, Jr., Asst. U.S. Atty., Ted S. Helwig, Asst. U.S. Attys., for plaintiff-appellee.

Before FLAUM, EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FLAUM, Circuit Judge.

Appellant Gustavo Chaverra–Cardona was convicted by a federal jury of conspiracy to kill an Assistant United States Attorney (AUSA) and solicitation of another to commit that crime (Counts I and III), and conspiracy to kill a government witness and her children and solicitation of another to commit that crime (Counts II and IV). Chaverra was sentenced to life imprisonment on Count I to be served consecutively to two consecutive fifteen-year sentences imposed in a separate but related narcotics case. Chaverra also received five years, twenty years, and five years on Counts II, III, and IV, respectively, to be served concurrently with the life sentence.

Appellant Oscar Urego was convicted along with Chaverra on Count II, conspiracy to kill a government witness and her children. Urego was sentenced to three years' imprisonment.

On appeal, both Chaverra and Urego challenge their convictions. Chaverra additionally challenges his sentences of life imprisonment and twenty years for conspiracy and solicitation to kill an AUSA. We affirm.

I.

Chaverra's plot to murder AUSA Ruben Castillo hatched while Chaverra was being held in custody awaiting trial on narcotics charges. Castillo was the prosecutor who had obtained the grand jury indictment charging Chaverra and others with narcotics violations involving over thirty pounds of cocaine having a street value of more than $3,000,000. During the course of the

narcotics investigation, Castillo obtained the cooperation of Fanny Altamirano, a maid who had worked for Chaverra and who was willing to testify against him at trial. The information provided by Altamirano also enabled Castillo to obtain a superseding indictment adding Chaverra's wife, Ruth, and his brother as defendants. While incarcerated at the Metropolitan Correctional Center in Chicago (MCC) awaiting trial, Chaverra received a message from Ruth saying that Altamirano had "snitched" on them.

After receiving the message, Chaverra arranged a meeting with another inmate, Eddie Ayala, who, unknown to Chaverra, was a government informant. The two met on the roof of the MCC where Chaverra asked Ayala to assist him in killing both Castillo and Altamirano. Chaverra told Ayala that he hated Castillo for having his wife arrested and for inducing Altamirano to cooperate. He stated that he did not care that the government would just appoint another prosecutor to the case. Chaverra asked Ayala to enlist professionals from Florida to do the killings and offered to pay $50,000 for the murder of Castillo, $25,000 for the murder of Altamirano, and $30,000 to Ayala for his help. Chaverra additionally wanted Altamirano's two children killed because he thought it would look funny if the mother disappeared leaving the children behind. The men discussed the weapons, automobiles, and personnel from Chicago and Miami that would be needed to carry out the murders, and they talked about alternative methods of killing the prosecutor, including stabbing him to death in the elevator of the federal building and shooting him in the head with a machine gun.

Ayala reported this conversation to the Drug Enforcement Administration (DEA) agents with whom he was working. During the next three and a half weeks, the agents monitored the progress of the conspiracy through Ayala, his brother Carlos, also a government informant who helped coordinate the plot from outside the MCC, and two DEA agents who posed as professional hitmen from Miami. The informants and agents witnessed or participated in numerous conversations in which details of the plan were discussed, such as the timing of the kills, whether Altamirano should be poisoned with Colombian candy, and whether the price of the hits included the cost of machine guns or whether the hitmen would use their own guns. The investigation culminated in a tape recorded and videotaped conversation between Chaverra and Ayala at the MCC, after which DEA agents arrested six persons, including Appellant Oscar Urego.

## II.

■ On appeal, Chaverra and Urego first argue that they were unduly prejudiced by the admission at trial of extensive testimony concerning the underlying drug case and Chaverra's drug trafficking and finances. They claim that the district judge abused his discretion under Federal Rule of Evidence 403 by admitting the testimony. Specifically, appellants contend that the testimony created an image of them as Colombian drug dealers which improperly influenced the jury's verdict.

Both the appellants and the government agree that some evidence of the underlying drug case and drug transactions was clearly probative and admissible under either Fed.R.Evid. 404(b) to show motive, intent, knowledge, and opportunity, or under what may be called the "related bad acts" exception to the general rule against introduction of evidence of prior bad acts. *See United States v. Monzon*, 869 F.2d 338, 343–45 (7th Cir.1989) ("[E]vidence of other acts or crimes which are 'intricately related to the facts of the case' are admissible without reference to Rule 404(b)") (quoting *United States v. Hawkins*, 823 F.2d 1020, 1023 (7th Cir.1987)). Under either exception, however, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403; *Monzon*, 869 F.2d at 343; *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984). The appellants argue that although the underlying drug case was clearly relevant to the subsequent plot to murder the prosecutor and the key witness, the district court abused its discretion

in allowing such *extensive* testimony concerning Chaverra's narcotics activities. We disagree.

The appellants complain of excess in the presentation of three categories of evidence which they believe crossed the line from admissible to unfairly prejudicial. First, appellants challenge the evidence presented on the underlying drug case—in particular, testimony concerning the circumstances of the narcotics arrests, the items seized, and the subsequent bond hearings. The scope of that testimony ranged from significant to trifling detail. On one end of the spectrum, and in the appellants' view the most damaging, was the testimony elicited concerning the amount (fifteen kilograms) and street value of the cocaine that was seized, the cooperation of Altamirano in the indictment of Ruth, the condition of Ruth's bond that she not threaten or harrass Altamirano, the denial of bond for Chaverra, and the family relationships between Ruth, Urego, and Chaverra. Appellants argue that revealing to the jury the amount and value of the cocaine, the relationships among the players, and the circumstances of the bonds caused the jury to perceive Chaverra as a major drug dealer who operated a large drug ring. We agree—but we also find that information to be highly probative of motive, intent, knowledge, and opportunity. A staggering number of drug cases are prosecuted each year, yet the defendants in those cases do not ordinarily plot to murder the prosecutor and key witness nor do they have the power and resources to carry out such a plot from behind bars. Evidence of Chaverra's narcotics operation, including the amount of drugs involved and the family relationships of the defendants, not only established the factual scenario that gave rise to the murder plots but provided the jury with relevant information as to Chaverra's motive and ability to carry out his scheme.

Focusing solely on the issue of motive, the appellants argue that it would have been sufficient to tell the jury that Chaverra was facing the possibility of ninety years imprisonment and a $1,000,000 fine. While that method of showing motive may

have been an option for the prosecution, we note that many narcotics violations that involve relatively small amounts or small operators carry high penalties. Moreover, most jurors realize that defendants often do not, and know they will not, receive the maximum penalty. Establishing the enormity of Chaverra's drug dealings, power, and resources, and the relationships among the parties was therefore highly probative of not only motive, but intent, knowledge, and opportunity. Given the probative value of the evidence, we find that the district judge did not abuse his discretion in making the Rule 403 determination. In addition, the record shows that the court carefully considered the probative and prejudicial weight of the evidence and issued limiting instructions to the jury.

■ Turning to the other end of the spectrum, the prosecution elicited testimony concerning minute details of the drug investigation, including such things as the time of day the surveillance was conducted and the name of the drug-sniffing dog, Rex, who alerted the officers to the narcotics. Appellants argue that these details were not probative of the issues on trial. We agree—but we also find that the information was not prejudicial either. Rule 403 requires the district court to balance the probative value and potential prejudicial impact of evidence. Evidence must be excluded under the rule only where the probative value is *substantially* outweighed by the possibility of *unfair* prejudice. Where both the probative and prejudicial weight of evidence is zero, there has been no abuse of discretion.

The second category of challenged testimony concerned prior dealings between Chaverra and Ayala. Appellants argue that Ayala's testimony regarding his own criminal history would have been sufficient to establish that he was a logical person for Chaverra to contact if one were looking for professional killers, and that presenting details of Chaverra's and Ayala's relationship was unfairly prejudicial. We disagree. The prosecution elicited testimony that: (1) Ayala had helped smuggle Chaverra and his family into the United States; (2) prior

drug transactions between the two had resulted in a debt owed to Chaverra by Ayala; (3) Ayala and his brother Carlos had previously acted as "hitmen" or "musclemen"; and (4) Chaverra had once hired Ayala as a muscleman. All of this evidence was offered to explain why Chaverra would feel safe to approach Ayala and ask him to assist in the murders. We find the evidence was offered for a proper purpose and that its probative value outweighed its prejudicial effect.

■ The final category of challenged evidence was Chaverra's testimony, elicited on cross-examination, concerning his finances. Appellants argue that the relevance of the evidence was negligible. We disagree. The evidence was probative of Chaverra's resources and ability to devise and carry out the murder schemes, and its probative value was not outweighed by the danger of unfair prejudice.

## III.

Appellants next argue that the evidence was insufficient to support their convictions. Chaverra primarily contends that the testimony of Ayala was unreliable. Urego asserts that the evidence merely showed that he was an unwitting errand boy.

■ The crux of Chaverra's argument is that although Ayala testified to the participation of others in the conspiracy to kill the prosecutor, the evidence was insufficient to establish that other unindicted co-conspirators existed. He claims that because none of these others testified at trial the evidence was insufficient to show that he conspired with anyone other than the informant Ayala. We disagree.

Ayala testified to approximately twelve conversations with Chaverra in which the two discussed the plot(s) in detail, including names and roles of the other participants. Chaverra partially corroborated Ayala's testimony by admitting that he had conversations with Ayala and that the two discussed killing Castillo and Altamirano. (He merely denied that it was his idea or that any agreement had been reached.)

Ayala's testimony was also corroborated by the tape recording/videotape of the last conversation and the testimony of various witnesses, including the DEA agents who posed as hitmen, Ayala's informant brother Carlos, and appellant Urego. Moreover, the government presented testimony of a planned meeting at Ravenswood Hospital at which Carlos and one of the agents posing as a hitman were to meet two of Chaverra's people, namely, "Jose and his girlfriend." While Carlos and the agent were waiting at the hospital, the agent received a phone call from a female who asked for Carlos by name and stated that her boyfriend said they would be a few minutes late and instructed them to wait. The two never showed up, but Chaverra told Ayala the next day that his people had gone to the hospital but were unable to make contact because of the poor description they had been given of Carlos. The phone call further corroborated Ayala's testimony regarding the participation of others in the conspiracy. The jury weighed the evidence and credited Ayala's testimony, and this court will not reverse the jury's determination as to matters of credibility.

■ As to Urego's assertion, the evidence at trial showed that he was far from an innocent errand boy. Urego served as a conduit for information between Chaverra and the agent-hitmen, and he knew the content of the messages he relayed. Urego informed the hitmen that the murder of Altamirano would have to be delayed so long as Ruth was out on bond, for fear that she would be arrested. At one point, Urego told the hitmen that Chaverra had decided to hire two local people to kill Altamirano instead, but that they should not return to Miami until Chaverra gave further instructions. Urego gave the hitmen a telephone number so that they could contact him to obtain Chaverra's instructions. Urego's statements and actions demonstrated both his understanding of and assistance in the conspiracy to kill Altamirano. The jury so found, and we will not reverse the jury's determination.

## IV.

Lastly, Chaverra challenges his sentences of life imprisonment and twenty years for conspiracy and solicitation to murder the prosecutor. Chaverra recognizes that his sentences are within statutory limits and that courts have broad discretion in imposing a sentence within the statutory range. *United States v. Neary,* 552 F.2d 1184, 1192 (7th Cir.), *cert. denied,* 434 U.S. 864, 98 S.Ct. 197, 54 L.Ed.2d 139 (1979). Chaverra also concedes that the sentencing judge may consider the background of the individual offender and not just the evidence admissible at trial. *United States v. Harris,* 558 F.2d 366, 372 (7th Cir.1977). Finally, Chaverra does not contend that the judge relied on improper considerations or unreliable information. Rather, Chaverra argues that the sentencing judge abused his discretion by failing to consider Chaverra's actual culpability.

In essence, Chaverra argues that because the government stepped in and prevented the conspiracy from reaching fruition, no one was harmed and, therefore, Chaverra's culpability is somehow lessened. We find this argument to be without merit. Chaverra cites no authority other than the maxim that "the punishment should fit the crime." The crimes of conspiracy and solicitation to murder a government prosecutor are gravely serious offenses, and the fact that the scheme did not succeed does not lessen Chaverra's culpability.*

## V.

For the reasons stated herein, the judgment of the district court is AFFIRMED.

---

* Chaverra also raises several points in a supplemental *pro se* brief. We have reviewed the issues raised and find them to be without merit.