UNITED STATES of America,
Plaintiff–Appellee,

v.

Danny SHORT and David S. Bittis,
Defendants–Appellants.

Nos. 92–3100, 92–3062.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1993.

Decided Aug. 24, 1993.

James L. Santelle, Asst. U.S. Atty., Office of the U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee.

Kirsten K. McWilliams, Michael A. Yamat (argued), Jones & Associates, Milwaukee, WI, for defendant-appellant Danny B. Short.

Michael B. Sandy, Milwaukee, WI (argued), for defendant-appellant David S. Bittis.

Before CUMMINGS, FLAUM and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

From the fall of 1985 through the spring of 1988, Danny Short and David Bittis bought junk cars at local auctions, but instead of restoring the cars, they used their vehicle identification numbers (VINs) in a scheme to sell stolen cars without getting caught. They, or car thief George Van Trece, stole new cars of the same model as the salvaged cars, and then Short and Bittis replaced the stolen cars' VINs with those of the salvaged cars. After preparing fake title documents, the defendants sold the stolen cars to unsuspecting buyers. On June 3, 1992, a jury found Short and Bittis guilty of conspiring to remove, obliterate, tamper with, and alter the VINs. Short was also convicted of four counts of knowing and unlawful possession of, with the intent to sell, motor vehicles bearing altered VINs. We affirm the convictions, but vacate Short's sentence and remand to the district court for resentencing.

## I.

Short and Bittis made their money on the difference in value between the older, worn-out cars or trucks they purchased at auctions or salvage yards and the newer cars or trucks they stole. To conduct their scheme, the defendants would buy an older vehicle in the legitimate market and then look for a car of the same make and model on the street, in a parking lot, or on a car dealer's lot. Next, they would steal, or arrange for the theft of, the newer car and bring both cars either to Short's farmhouse or to a local auto body shop. They would replace the vehicle identification number on the new car with the VIN on the legitimately-purchased older car. After Kristie Hartung, Short's wife at the time, prepared fraudulent title, registration, and transfer documents, the defendants looked for a buyer or contacted the buyer they had already located. The subsequent sale looked perfectly legitimate to an unsuspecting buyer, with all of the paperwork seemingly in order.

At trial, Kristie Hartung, who by then was Short's ex-wife and who had been given a grant of immunity, testified extensively about both defendants' criminal activity. She described the cars and trucks they stole and the methods they used to steal the vehicles, from stripping the steering column with a screwdriver to having an extra set of keys made while test driving a car. Hartung's close proximity to the criminal planning and activity, much of which took place at her house, and her occasional participation in the crime allowed her to testify in detail about the entire course of the conspiracy. George Van Trece also testified, pursuant to a plea agreement. Judging from Van Trece's testimony, he seemed to be more of a freelance car thief than a true coconspirator; Short and Bittis described the make and model they needed, Van Trece delivered the vehicle, and they immediately paid him from three hundred to eight hundred dollars. He confirmed his theft, on behalf of Short and Bittis, of several of the specific vehicles involved in the conspiracy.

John T. Armfield, an investigator for the National Auto Theft Bureau, also testified on behalf of the government. He told the jury that every car in the United States can be identified through its vehicle identification number, a seventeen-character sequence of number and letters. Armfield described the routine placement of the public VIN where the left side of the dashboard and the windshield meet and the additional tagging of each car with the same VIN or a nine-character derivative of it on either the transmission, the engine block, or another location. Cars also bear confidential VINs, stamped on substantial, difficult-to-remove parts of the car. As part of his job locating and investigating stolen motor vehicles, Armfield checks the confidential VIN against the public VIN. While he conceded on cross-examination that the use of spare parts can sometimes lead to mismatched numbers, an investigator can determine whether any of the numbers come from stolen vehicles through a national computer system that keeps track of the numbers. Armfield examined nine vehicles identified in the indictment, and he linked the mismatched VINs with cars reported stolen. He also traced the cars back to the defendants.

## II.

■ Short contests the admission of testimony by his ex-wife, Kristie L. Hartung. Before trial, the government moved in limine for permission to introduce testimony by Kristie Hartung, under three exceptions to the marital communications privilege. First, the privilege does not apply to statements made in the presence of a third party. Second, the privilege does not cover a spouse's observations during the marriage. Third, because Hartung played a limited role in the conspiracy, her testimony was admissible under the "joint participant" exception. Over Short's objection, the district court granted the motion, to the extent that the govern-

ment could demonstrate the applicability of an exception at trial.

■ The marital communications privilege reflects the value our society places on uninhibited communication between spouses. We encourage married people to confide in each other by protecting their statements from later scrutiny in court. The cost of the privilege is the reduction in truthful disclosure about criminal activity. *See United States v. Byrd,* 750 F.2d 585, 589 (7th Cir.1984) (interpersonal relationship privileges "must be narrowly construed because they are in derogation of the search for truth ...."). Exceptions to the privilege result from the tension between the cost of reducing our ability to punish criminals and the value of increased spousal communication. For example, we only protect statements made in absolute confidence; that necessary element is lost when spouses permit third parties to witness their communications. Because testimony about first-hand observations would not affect the decision to confide in one's spouse, the privilege does not extend to descriptions of observations. In addition, we do not value criminal collusion between spouses, so any confidential statements concerning a joint criminal enterprise are not protected by the privilege. *See id.* (citing cases).

The defendant concedes that most of the testimony by Hartung fell under either the observation exception or the presence of third parties exception.[1] He argued, however, that the portions of Hartung's testimony that did not involve observations or statements made in front of Bittis, Van Trece, or the children should have been excluded because the government did not show that she was a joint participant in the commission of the crime. As the defendant notes, Hartung was not indicted, nor does the government describe her as an unindicted coconspirator. Her testimony, however, supported the government's theory that she aided and abetted the conspiracy. Hartung testified that she prepared title assignments, registration

1. In his brief, the defendant did not attempt to identify the specific statements within Hartung's testimony that were not admissible under any exception. We will not comb through Hartung's extensive testimony for the admittedly few possible violations. At argument, when we asked the defendant to point out testimony outside the two agreed exceptions, he referred us to the government's brief. Therefore, we will analyze only the three statements offered by the government as testimony which may have required the "joint participant" exception for proper admission.

forms, and other documents necessary for selling the cars to legitimate buyers. Tr. 374–78, 383–85, 433. She aided the defendants in concealing the crime, by making a suggestion about how to paint over an identifying feature of a stolen car. Tr. 411. On another occasion, she even helped her husband replace certain car parts. Tr. 420–21. Furthermore, she testified pursuant to an agreement with the government granting her immunity from prosecution. Tr. 313–16; *cf. Byrd,* 750 F.2d at 594. These factors confirm the government's theory that, while she played a minor role, she nonetheless aided and abetted the conspiracy to a sufficient extent that the marital communication privilege did not apply to all of her testimony.

■ The difficulty lies in the timing of her participation. According to her own testimony, Hartung initially prepared title documents under a misconception that the documents were legal (Tr. 365) and witnessed the car theft with approbation. She only gradually became a joint participant, in the sense that she knowingly aided and abetted the conspiracy. Two of the three statements offered under the joint participant exception concern disclosures by her husband which may have occurred before she joined in the crime: Hartung testified that Short explained how he made an extra set of keys during a test drive in order to steal the first car in 1985 (Tr. 322) and Short told her he kept unattached vehicle identification tags, with the title documents, in the house until he needed them. Tr. 358. Just as a marital communications privilege continues to protect pre-divorce disclosures by an ex-spouse, so might the privilege protect disclosures made before the spouse becomes a joint participant in the crime. *See Byrd,* 750 F.2d at 591 (the survival of the privilege after divorce assures spouses that their marital communications will never be disclosed).

We review a district court's admission of evidence for an abuse of discretion, *United States v. Lofton,* 957 F.2d 476, 477 (7th Cir. 1992), and "[w]e will overturn a conviction on evidentiary grounds only if the erroneous ruling had a 'substantial influence over the jury.'" *United States v. Saunders,* 973 F.2d 1354, 1359 (7th Cir.1992) (citation omitted).

In this case, most of Hartung's testimony was properly admitted under either the observation exception or the presence of third parties exception. Moreover, the government offered enough evidence that Hartung aided and abetted the commission of Short's crime to admit part of her testimony under the "joint participant" exception. The two statements noted may fall outside any of the three argued privileges, although the timing of the testimony about the tags is unclear. In any event, the bulk of her crucial testimony, and other substantial evidence against Short, was properly admitted. Therefore, admitting the two additional statements she made, if error, was harmless error. *See Lofton,* 957 F.2d at 477–78.

### III.

■ Short argues that the district court erred in calculating his sentence. The court made an upward departure under the Sentencing Guidelines, increasing Short's criminal history category from III to IV. The adjustment, which reflected the judge's belief that the defendant's criminal history had been underrepresented in light of his prior convictions and several pending state charges against him, altered the guideline range from 33 to 41 months to 41 to 51 months. After stating that the original criminal history category "just doesn't do the job," the district court sentenced Short to 48 months.

■ A judge may consider pending charges, dismissed charges, or even charges of which the defendant has been acquitted, in determining whether the defendant's criminal history category is appropriate. *United States v. Ruffin,* 997 F.2d 343, 345 (7th Cir. 1993); *United States v. Masters,* 978 F.2d 281, 285–86 (7th Cir.1992). The Guidelines permit a departure from the otherwise applicable range if "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3. "[I]t is prior criminal *conduct,* and not prior *charges,* that supports a departure." *Ruffin,* 997 F.2d at 346. At sentencing, the standard of proof a prosecutor must meet is a preponderance of

the evidence. *United States v. Fonner*, 920 F.2d 1330, 1333 (7th Cir.1990). Because prior conduct is the key factor, the district court must make an independent determination that a preponderance of the evidence indicates that the defendant committed the crime. *See Ruffin*, (case remanded for resentencing because no evidence that district court made an independent finding that defendant actually committed crimes for which charges were dismissed).

■ In this case, there is no evidence in the record that either the prosecutor or the presentence report author made an independent investigation of the pending state charges against the defendant, or that the prosecutor established the criminal conduct which led to those charges by a preponderance of the evidence. The Guidelines require "reliable information" in support of a judge's decision that the applicable criminal history category is underrepresentative. The sentencing transcript does not reflect any indicia of reliability on which the district court could reasonably have concluded that Short engaged in the charged conduct. Instead, the district court apparently made no separate determination of the likelihood that the conduct took place, but simply accepted wholesale the presentence report's summary of the state charging papers.

■ The government's alternative argument in support of the criminal history category departure is that the sentence could have been based on Short's prior convictions which were not counted toward setting his criminal history. The prior convictions were municipal violations and other petty offenses, which the Guidelines have already found unworthy to include in calculating a criminal history category. Therefore, deemed too insignificant to include in the first place, they are equally unworthy as a reason to depart upward to the next category. The adjustment from category III to IV cannot be justified on this record, and we vacate Short's sentence and remand for resentencing.

## IV.

■ Bittis raises two arguments contesting his conviction. First, he argues that the district court committed reversible error by refusing to compel the government's expert witness to reveal facts on which his opinion was based. Specifically, John T. Armfield declined to answer, under cross-examination, the defendant's question about the location of confidential VINs on cars. Testifying that the disclosure of the exact locations would seriously undermine law enforcement efforts to prevent frauds of the sort with which the defendants were charged, Armfield refused to reveal the confidential information without a direct order from the court to do so. On two occasions, the court declined to direct the witness to answer. Tr. 235–36, 248.

We review a district court's evidentiary rulings for an abuse of discretion, and "in so doing, give the trial judge great deference." *Doe v. United States*, 976 F.2d 1071, 1076 (7th Cir.1992) (citations omitted). Bittis' defense to Armfield's testimony apparently was that the defendants unknowingly purchased stolen spare parts bearing confidential VINs on the legitimate market. Without requiring Armfield to disclose the precise location of the confidential VINs, Bittis claims that he could not know which receipts to produce in court to demonstrate the valid purchase of the parts bearing those VINs. Initially, we note the difficulty any defendant, much less one laboring under the lengthy testimony of two eyewitnesses who participated in the crime, would face in convincing a jury of this story, that he was unlucky enough to make unknowing purchases of stolen auto parts and then be linked to nine vehicles bearing confidential VINs traceable to stolen cars. Moreover, the district court limited its denial of counsel's request to direct the witness to answer at that point in the trial. The court left open the possibility that it might direct Armfield to disclose the information if Bittis raised the issue again, presumably after a sufficient showing of relevance, but Bittis did not return to the issue in presenting his case. He has not offered evidence that he produced or could have produced any receipts for automobile parts which might have been stamped with the confidential numbers.

■ The purpose of marking motor vehicles with confidential VINs is to enable law

enforcement agents to identify stolen vehicles even if the criminals have attempted to conceal their crime by obliterating or removing the VINs they discover on the car. *See, e.g. United States v. Seavoy*, 995 F.2d 1414 (7th Cir.1993) (after armed robbery, police find defendants by tracing confidential VIN despite robbers' attempt to destroy evidence by stripping the other VINs and setting getaway car on fire). Armfield testified that the manufacturers allow only NATB agents to enter and tour the area of the plant where the secret VINs are stamped into a variety of locations on vehicles. The public and even law enforcement agents are not permitted to tour this area of the plant, to maintain the utmost secrecy.

Bittis did not show a substantial need to learn the precise location of the VIN on any specific vehicle by, for example, producing a receipt for the entire car frame. He has not demonstrated the substantial prejudice which would overcome the legitimate and narrow restriction on the cross-examination allowed by the district court. Bittis argued his theory to the jury, and he had the opportunity to produce every receipt he possessed. Under cross-examination, Armfield conceded both that stolen car parts may be purchased on the legitimate market and that mistakes at the manufacturing plant could account for some inconsistent VINs. Armfield also admitted that several cars he inspected during his investigation carried inconsistent VINs but were not stolen cars. The defendants offered several explanations, admitted to be possible by Armfield, of how the cars seized could bear inconsistent VINs without any wrongdoing on the part of the defendants. Their inability to persuade the jury that the defendants made legal purchases of stolen parts did not result from an abuse of the district court's discretion.

## V.

Bittis' second argument concerns an unusual problem with the jury, which led to the dismissal of one juror and the use of an alternate. On June 2, juror Rosalie Newkirk received a threatening telephone message related to her jury service on her answering machine which she reported to the police who in turn brought in the Federal Bureau of Investigations. Late that night, the matter was brought to the attention of the court, and the following morning, the district judge held an in-chambers conference, on the record, among the prosecutor, the juror, counsel for Short (who had been alerted the evening before), and two FBI agents. The court also directed the bailiff to go into the jury room to determine whether Newkirk's absence or any rumor of the threat itself affected the jury's proceedings.

After listening to the telephone machine tape and the juror's response to it, the district court discharged Newkirk, based on the threat and her related contact with federal authorities. An alternate juror remained on the panel, so no addition was necessary. Later that day, after the return of the jury's verdict, the district court conducted another in-chambers conference and disclosed the threat to Bittis' counsel for the first time. Both defense counsel and the prosecutor had an opportunity to comment on the best way to ensure the integrity of the verdict without unduly upsetting the remaining jurors. The court eventually questioned the jury about whether they knew why Newkirk did not complete the deliberations and whether her absence had any effect on their verdict. The jury responded negatively and the court discharged them. Tr. 1470–71.

Although it is somewhat unfortunate that counsel for Bittis was not told of the threat at the first conference, we find that the district court handled the situation competently and with no prejudice to Bittis' right to a fair and impartial jury. The court removed the threatened juror at the appropriate time, an alternate who had already begun deliberating continued in that juror's place, and all counsel had the chance to participate in the resolution of the potential problem. Besides, Bittis' counsel explicitly agreed to the procedure selected by the district court. In fact, he was the one who first suggested the compromise method of questioning the jurors together as a panel (Tr. 1467–68), and therefore, he will not be heard to challenge the procedure now.

Both convictions are AFFIRMED. Short's sentence is VACATED and his case REMANDED for resentencing consistent with this opinion.