In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3870

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GUY J. WESTMORELAND,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 98 CR 30022—**William D. Stiehl**, *Judge.*

ARGUED SEPTEMBER 12, 2002—DECIDED DECEMBER 3, 2002

Before RIPPLE, ROVNER and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Guy J. Westmoreland was indicted on five counts of a six-count multi-defendant indictment. He was charged with: causing the death of a person through use of a firearm during a drug trafficking crime; use of interstate commerce facilities to commit murder for hire; conspiracy to commit murder for hire; tampering with a witness by committing murder; and causing the death of a witness through use of a firearm. On June 28, 2001, a jury found Mr. Westmoreland guilty on all five counts.

Mr. Westmoreland previously had been convicted of conspiracy to distribute a controlled substance.[1] On October 25, 2001, the district court imposed sentences with respect to both convictions. Mr. Westmoreland was sentenced to 240 months' imprisonment on the previous drug conviction and to a term of life imprisonment without the possibility of parole on counts 2-6 of the later conviction. On October 26, 2001, Mr. Westmoreland filed a timely notice of appeal from his second conviction. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

Beginning in the spring of 1997, Mr. Westmoreland was a partner of Richard Abeln ("Abeln") in a drug distribution business. The two confederates used Abeln's plane to import nine kilograms of cocaine and about ninety pounds of marijuana from Texas to a small airport in Illinois. In early January 1998, they were arrested for the murder of Abeln's wife, Debra Abeln. Some months before, Abeln had decided to terminate his marriage; but, because he did not wish to split the assets of his $17 million trucking business with his wife, he decided to have her killed.

A few months later, Mr. Westmoreland happened to mention that he could have someone killed for $1,000. Abeln approached Mr. Westmoreland about such a possibility; after initially declining, Mr. Westmoreland agreed. Abeln testified that, to encourage Mr. Westmoreland to participate in the scheme, he had told Mr. Westmoreland that

---

[1] This earlier conviction was affirmed by this court in *United States v. Westmoreland*, 240 F.3d 618, 637 (7th Cir. 2001).

his wife had discovered their drug business and was going to inform law enforcement authorities.

Mr. Westmoreland recruited Deandre Lewis ("Lewis") to commit the murder. Abeln and Mr. Westmoreland agreed that the murder would occur on December 27, 1997, at a local airport and that it would be staged as a robbery gone bad. Lewis drove to the airport in a blue Dodge pick-up truck provided by Mr. Westmoreland. On the pretext of changing a plane part, Abeln drove his wife to the airport; their twelve-year-old son, Travis, accompanied them. Upon their arrival, Lewis approached the car, demanded Mrs. Abeln's jewelry, then pulled her from the car and fired two shots from a double-barreled shotgun into her chest. She died at the scene.

At the time of the murder, Mr. Westmoreland was on vacation with his family in Florida; but, upon his return, he helped Lewis dispose of the jewelry. After his arrest on January 6, 1998, Mr. Westmoreland directed the destruction of evidence from his jail cell, including the removal of marijuana from a pinball machine at the Westmoreland's house. Tr.VIII at 135. Mr. Westmoreland's wife and sister proceeded to remove the drugs and destroy cocaine packaging. *Id.* at 137-39. Additionally, Mr. Westmoreland ordered his wife to arrange for the destruction of the murder vehicle, the blue Dodge pick-up truck, which directions his wife followed by having the truck crushed. *Id.* at 140-44.

## II

### DISCUSSION

In this appeal, Mr. Westmoreland asks that we review several evidentiary issues that arose in the course of the proceedings in the district court.

## A.

The district court admitted Mr. Westmoreland's statement to his wife, Bronnie Matthews, that he had supplied Abeln with the phone number of a hit-man.[2] The court based its ruling on the Government's representation that Mr. Westmoreland had repeated the statement to his parents and therefore the marital communications privilege was not applicable. Ms. Matthews later testified that her husband had not repeated the statement. Consequently, Mr. Westmoreland moved to strike the previously admitted statement and further moved for a mistrial. The district court denied the motions on the ground that the statement was admissible under the "joint participant" exception to the marital privilege.

We review the trial court's resolution of a marital privilege issue for an abuse of discretion. *United States v. Lea*, 249 F.3d 632, 641 (7th Cir. 2001). The marital communications privilege is well-established in the federal courts. *See Blau v. United States*, 340 U.S. 332, 333-34 (1951). As early as its decision in *Stein v. Bowman*, 38 U.S. (13 Pet.) 209, 223 (1839), the Court set forth the rationale that animates the privilege:

> This rule is founded upon the deepest and soundest principles of our nature. Principles which have grown out of those domestic relations, that constitute the basis of civil society, and which are essential to the enjoyment of that confidence which should subsist between those who are connected by the nearest and

---

[2] At the time of the alleged events, Mr. Westmoreland was married to Bronnie Westmoreland. They subsequently divorced, and Mrs. Westmoreland married Brad Matthews, changing her name to Bronnie Matthews. *See* Tr.VIII at 21-24.

dearest relations of life. To break down or impair the great principles which protect the sanctities of husband and wife, would be to destroy the best solace of human existence.

The basic principles that govern the application of the privilege are well-settled in this circuit. *See Lea*, 249 F.3d at 641. Although the "cost of [this] privilege is a reduction in truthful disclosure," our society places a higher value on "uninhibited communication between spouses." *Id.* The privilege can be asserted by either spouse and applies to statements made in confidence by one spouse to another during a valid marriage. *Id.*[3]

Because the marital communications privilege places a limitation on truthful disclosure, we have recognized an exception to the privilege when spouses are joint participants in the underlying offense. *See United States v. Short*, 4 F.3d 475, 478 (7th Cir. 1993). The reason for this limitation is straightforward. "[W]e do not value criminal collusion between spouses, so any confidential statements concern-

---

[3]  There are two clearly recognized marital privileges: the marital testimonial privilege and the marital communications privilege. Mr. Westmoreland's contention concerns the latter. Distinct differences exist between the purposes of the two privileges.

> The testimonial privilege looks forward with reference to the particular marriage at hand: the privilege is meant to protect against the impact of the testimony on the marriage. The marital communications privilege in a sense, is broader and more abstract: it exists to ensure that spouses generally, prior to any involvement in criminal activity or a trial, feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law.

*United States v. Lofton*, 957 F.2d 476, 477 (7th Cir. 1992) (quoting *United States v. Byrd*, 750 F.2d 585, 590 (7th Cir. 1984)).

ing a joint criminal enterprise are not protected by the privilege." *Id.* Other circuits similarly have held that conversations about ongoing or future criminal activity that the spouses are undertaking jointly are not protected by the marital communications privilege. *See United States v. Ammar*, 714 F.2d 238, 257 (3d Cir. 1983) (collecting cases).

In this case, Mr. Westmoreland revealed his participation in the murder before his wife undertook any actions that made her an accessory-after-the-fact.[4] Mr. Westmoreland submits that, when the communication is made to the spouse before the spouse joins in the criminal activity, the marital privilege ought to shield the communication, at least when, as here, the spouse later becomes a mere accessory-after-the-fact and not a participant in the underlying crime. We have not had occasion to decide this precise issue.

We turn to the decisions of our colleagues in circuits that have dealt with similar situations. The Second Circuit has considered whether the marital communications privilege should apply to a statement made in confidence to a spouse who later became an accessory-after-the-fact. *See United States v. Estes*, 793 F.2d 465, 466 (2d Cir. 1986). As in our case, in *Estes,* the defendant spouse had informed his wife that he had participated in criminal activity. The Second Circuit held that this statement was not made in the course of ongoing joint criminal conduct. *See id.* Until that communication was made to her, reasoned

---

[4] The Government does not argue before us that Ms. Matthews was a member of the drug conspiracy, that the murder of Ms. Abeln was in furtherance of that conspiracy and that the statements in question were made to Ms. Matthews in the course of that conspiracy.

the court, the defendant's wife did not know that an illegal act had taken place. "The communication to her of that knowledge was a necessary precursor to her involvement and therefore could not have been made as part of an ongoing joint criminal activity." *Id.* Notably, the court contrasted this initial statement with later conversations that took place after the wife had begun to participate in the criminal activity as an accessory-after-the-fact. These later conversations, opined the Second Circuit, would not be privileged. *See id.* at 467.

The Tenth Circuit, addressing the same issue in *United States v. Neal*, 743 F.2d 1441 (10th Cir. 1984), appears to have concluded that the marital communications privilege does not apply to a spouse who "actively participated as an accessory-after-the-fact." *Id.* at 1446. Although the contours of the court's holding are not entirely clear, it appears that the court took the view that later conversations and acts that took place when the spouses were engaged in joint criminal activity would bring the earlier initial conversation into the coverage of the exclusion. *Id.* at 1446-47.

In *Short*, we suggested, albeit in dicta, that the approach of the Second Circuit was most compatible with the purposes of the marital communications privilege. Now-Chief Judge Flaum wrote that the privilege well "might . . . protect disclosures made before the spouse becomes a joint participant in the crime" by aiding and abetting the principal. *Short*, 4 F.3d at 479; *see also Ammar*, 714 F.2d at 258 (noting that, although the marital testimonial privilege is designed to protect the marriage at the time of trial, the marital communications privilege attaches at the time the communication is made). He pointed out that the privilege is intended to preserve the confidentiality of the marital relationship at the time the communication

is made. "Just as a marital communications privilege continues to protect pre-divorce disclosures by an ex-spouse, so might the privilege protect disclosures made before the spouse becomes a joint participant in the crime." *Short*, 4 F.3d at 479. The approach set forth in *Short* has met with the approval of scholarly commentary. "The more carefully reasoned decisions distinguish between the initial disclosure, as to which the listening spouse is *not* a joint participant, and the later activities by which the second spouse may join the criminal enterprise." 3 Weinstein's Federal Evidence § 505.11 [2][c] (2d ed. 2002); *see also* 2 Christopher B. Muller & Laird C. Kirkpatrick, Federal Evidence § 207 (2d ed. 1994) (indicating that the "exception does not apply to communications made before both spouses have become involved in the criminal activity").

Given the purpose of the privilege for marital communications, we think that the approach foreshadowed in *Short* is the correct one. The initial disclosure of a crime to one's spouse, without more, is covered by the marital communications privilege. If the spouse later joins the conspiracy, communications from that point certainly should not be protected. This distinction is consistent with the purpose of the marital communications privilege. As one treatise has suggested, further expansion of the partners-in-crime exception to the marital privilege could "eventually reduce the marital communications privilege to a hollow shell." 25 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5601 (1989).

We emphasize that, in reaching this decision, we do not, because we need not, confront the situation faced by the Court of Appeals for the Fourth Circuit in *United States v. Parker*, 834 F.2d 408 (4th Cir. 1987). There, Justice Powell, sitting by designation, held that the marital communications privilege did not apply to "statements made

in the course of successfully formulating and commencing joint participation in criminal activity." *Id.* at 413. When the initial discussion of the past criminal endeavor is part of the solicitation and agreement of the spouse to participate in the cover-up, reasoned the Justice, the policy concerns that implicate the joint criminal participation exception are as much implicated as in later communications made during the criminal activity. *Id.*

Although we believe that the district court erred in admitting the initial communication between Mr. Westmoreland and his wife, this misstep does not automatically warrant reversal. We have held that, even if evidence barred by the marital communications privilege is improperly admitted, we must determine whether the error was harmless. *See United States v. Short*, 4 F.3d 475, 479 (7th Cir. 1993). The contested statement constitutes only two or three pages of more than 150 pages of the transcript containing Ms. Matthews' direct testimony against her husband. *See* Tr.VIII at 98-100 (Bronnie Matthews' testimony concerning Mr. Westmoreland's revelation of providing a hit-man's number to Abeln); Tr.VIII at 21-173 (Bronnie Matthews' direct testimony); and Tr.IX at 4-208 (balance of direct and cross). More importantly, the jury heard testimony from Mr. Westmoreland's conspirators, Abeln and Lewis, and heard tapes of Mr. Westmoreland's discussing the murder. *See* Tr.II at 98-99 (Abeln testifying that Mr. Westmoreland helped him murder his wife); Tr.II at 138-157 (Abeln providing detailed testimony of Mr. Westmoreland's participation in developing the murder plot); Tr.III at 16-21 (Abeln detailing Mr. Westmoreland's attempts to help him cover up the murder); Tr.X at 118 (Lewis testifying that he conspired with Mr. Westmoreland to murder Debra Abeln); Tr.X at 135-53 (Lewis' testimony of Mr. Westmoreland's direction in planning the murder); Tr.XI at 44 (Lewis describing Mr. West-

moreland's assistance in disposing of evidence). In light of this evidence, we believe that the error was harmless.

## B.

The district court admitted the testimony of Chris Sharp's wife, Tammy Sharp. She testified that, after learning of Sharp's involvement in the drug scheme, she had threatened to go to the police. She further testified that, one night, her husband returned to their home covered with blood. She further related that her husband had told her that he had helped Mr. Westmoreland bury the body of an individual who had owed Mr. Westmoreland money and who had "talk[ed] too much." Tr.XI at 232. She also testified that she regarded the statement as a personal threat.

Federal Rule of Evidence 801(d)(2)(E) provides that: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy." *Id.* For a statement to be admissible under Rule 801(d)(2)(E), the Government must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the person making the statement were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. *United States v. Stephens*, 46 F.3d 587, 597 (7th Cir. 1995). We review the trial court's determination under a clearly erroneous standard. *United States v. Stephenson*, 53 F.3d 836, 842 (7th Cir. 1995).

The statement was properly admitted. The record supports the district court's determination that Sharp was a member of the drug conspiracy and that the statement

was a threat to Sharp's wife. We cannot accept Mr. West-moreland's submissions that Sharp was not a member of the conspiracy and that the statements were not made in furtherance of the conspiracy. The record supports the district court's determination on both of these points. The record provides evidence that Mr. Westmoreland paid Sharp in drugs and cash to remodel a building for him. *See* Tr.XI at 228-29. Sharp also helped dispose of Mr. Westmoreland's drugs by selling them to others. *See* Tr.VIII at 41; Tr.X at 131-32. Moreover, the statements themselves provide evidence that Sharp was a member of the conspiracy. The district court was entitled to determine that the statements were made in furtherance of the conspiracy because, in making them, Sharp intended to preserve the conspiracy by frightening his wife in order to dissuade her from informing the authorities about the drug scheme. *See* Tr.XI at 232.

Mr. Westmoreland also submits that the testimony should not have been admitted because it was overly prejudicial under Federal Rule of Evidence 403. The district court acted well within its discretion in rejecting this claim. The testimony supported the Government's theory that Mr. Westmoreland was so committed to the drug conspiracy that he would kill in order to maintain it. Although the testimony does relate gruesome details, it is not overly prejudicial given the context of a trial for the murder of a potential witness.

Finally, we again point out that the record provides a significant amount of unchallenged evidence, including direct testimony by co-conspirators. Even if Tammy Sharp's testimony was improperly admitted, it was harmless error.

## C.

The district court admitted four tapes of incriminating conversations between Mr. Westmoreland and Abeln. These conversations were initiated by the Illinois State Police on a recorded telephone line and implicate Mr. Westmoreland in the death of Ms. Abeln. State Police Agent Freunz Lewis operated the equipment during the calls. Agent Lewis died just prior to the commencement of trial. Mr. Westmoreland claims that, in the absence of Agent Lewis' testimony, there was an inadequate foundation for the admission of the tapes.

The district court rejected Mr. Westmoreland's contention that the death of the tape recorder's operator made it impossible to lay an adequate foundation for admission. It relied upon the testimony of Agents Marty Milkovich and Calvin Dye, which had been admitted in Mr. Westmoreland's earlier drug trial. Agent Milkovich had testified that he was present when the calls were made, that he had listened in on headphones, and that the tapes were "first generation copies" of the tapes made that night. Tr.IV at 107. Mr. Westmoreland contends that this testimony was insufficient to authenticate the tapes and that the court abused its discretion in admitting them over his objections.

We see no basis for concluding that the district court abused its discretion in admitting the tapes. In this respect, we first note that Mr. Westmoreland's reliance upon *United States v. Faurote*, 749 F.2d 40 (7th Cir. 1984), is misplaced. We have rejected the formalistic approach of *Faurote* for the more inclusive approach of Federal Rule of Evidence 901(a), which provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its propo-

nent claims." *See Stringel v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 415, 420 (7th Cir. 1996) (rejecting formalistic approach to admission of tape recordings and noting that recollections of eyewitnesses are sufficient) (citations omitted). The Government must prove, by clear and convincing evidence, that the proffered tape is a true, accurate and authentic recording of the conversation between the parties. *See Smith v. Chicago*, 242 F.3d 737, 741 (7th Cir. 2001). In *Smith*, Judge Bauer, writing for the court, stated concisely that the Government may meet this burden by establishing the tape's chain of custody or by establishing otherwise a foundation as to the trustworthiness and accuracy of the evidence. He specifically noted that the recollection of eyewitnesses was sufficient to establish such a foundation. *Id.* at 742 (internal quotations omitted). The Government clearly submitted sufficient evidence to meet its burden here.

Finally, Mr. Westmoreland suggests that Agent Milkovich's reference to the tapes as "first generation copies" is somehow problematic. However, Federal Rule of Evidence 1003 provides that a duplicate is admissible to the same extent as an original unless there is reason to doubt the authenticity or it would be unfair. Even after affording himself of the opportunity to have the tape tested, Mr. Westmoreland has provided no reason to think such circumstances exist.

The district court reasonably relied upon the eyewitness testimony of Agents Milkovich and Dye to authenticate the tapes in the drug trial; consequently, it did not abuse its discretion.

**D.**

The district court admitted Government's Exhibit 118, an allegedly false letter, purportedly authored by Bronnie

Matthews and submitted at the sentencing hearing in Mr. Westmoreland's earlier drug trial. The court reasoned that the letter "goes to show a pattern of conduct . . . [by] the defendant's family and the defendant as well." Tr.X at 11. We review this ruling for an abuse of discretion. *United States v. Flores,* 5 F.3d 1070, 1080 (7th Cir. 1993).

Mr. Westmoreland submits that the letter did not constitute "relevant evidence" under Federal Rule of Evidence 401. The Government contends that the letter supported its contentions that Mr. Westmoreland's family sought to obstruct justice on numerous occasions by destroying items of evidence including marijuana, cocaine packaging materials, titles to stolen vehicles and the blue Dodge pick-up truck used in the murder.

Although we must give the district court a great deal of leeway with respect to determinations about the relevancy of the evidence, we find it difficult to discern any valid basis for the admission of this letter. Although it seems well-established that the letter was not written by Mr. Westmoreland's wife, the true author was never established and, more importantly, there was no evidence that Mr. Westmoreland knew of or even authorized the letter when it was presented to the court. Nor is there any evidence that the letter was later used by Bronnie Matthews to obstruct justice in this case. In light of these circumstances, we find it difficult to ascertain any basis for the letter's relevance in this proceeding. At the very least, the district court should have ruled the letter inadmissible under Federal Rule of Evidence 403. The prejudicial effect certainly outweighs any probative value.[5]

---

[5] Moreover, expert testimony on the issue of the letter's authenticity appears to have been collateral to Bronnie Matthews' tes-

(continued...)

The Government also submits that, in any event, admission of the letter constituted harmless error. In light of the significant amount of undisputed evidence of the defendant's guilt, we agree that the admission of a letter that, at best, indicated that some individuals associated or related to Mr. Westmoreland were attempting to cast him in a more favorable light would not have an appreciable effect on the jury's verdict.

## E.

The Assistant United States Attorney represented in her proffer that Lewis would, in the course of his testimony, mention a trip that he took with Mr. Westmoreland and Sharp to collect on a "drug debt" owed to Sharp and an intent to pistol whip the debtor. The district court rejected Mr. Westmoreland's argument that this testimony was admissible only if it conformed to the strictures of Federal Rule of Evidence 404(b). In the court's view, the proffered evidence was part of the drug conspiracy and not merely "other acts evidence." Tr.X at 90. When Lewis testified about the trip, he failed to refer to a "drug debt" or to Mr. Westmoreland's intent to pistol whip the debtor. Tr.X at 132-34. No contemporary objection was made by defense counsel.

We believe that, given the context of the testimony, the jury was entitled to infer that Mr. Westmoreland was on

---

[5] (...continued)
timony that she was not the letter's author. Allowing a handwriting expert to corroborate her testimony was impermissible under Rule 608(b). Rule 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence." *Id.*

a trip with Sharp to collect money as part of their joint enterprise in the drug conspiracy. Other testimony confirmed that Sharp was a member of the drug conspiracy and that the trip was made to further the ends of the drug conspiracy. Therefore, the evidence need not be evaluated in terms of Rule 404(b).

### F.

At trial, Mr. Westmoreland moved to exclude "evidence of drug trafficking conspiracy or of drug quantity." R.747 at 3 (citing R.683). The district court concluded that "[t]he charges, specifically use of a firearm during and in relation to a drug trafficking offense, and murder of a federal witness, are directly linked to and intricately related to the drug trafficking evidence." R.747 at 3. The district court relied upon our decision in *United States v. Chaverra-Cardona*, 879 F.2d 1551 (7th Cir. 1989). In that case, we concluded that "[e]vidence of [the defendant's] narcotics operation, including the amount of drugs involved" and "the enormity of [the defendant's] drug dealings, power, and resources" were probative in a trial for a murder plot because it provided the jury with useful information with respect to the defendant's motive and ability to carry out the plot. *Chaverra-Cardona*, 879 F.2d at 1554.

We believe that the district court was on solid ground in admitting this evidence. Notably, Mr. Westmoreland's two principal co-conspirators, Abeln and Lewis, testified that Mr. Westmoreland was motivated to arrange Debra Abeln's murder in order to protect the drug conspiracy. In light of *Chaverra-Cardona* and the motive linking the conspiracy and the murder, the district court did not abuse its discretion in admitting a significant amount of testimony concerning the drug conspiracy.

**Conclusion**

The judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*